Mr. Maloney. Good morning, may it please the court. This is an appeal from the district court's decision denying Mr. Hitt's motion for summary and declaratory judgment and granting the Oilgear Company's motion for summary judgment. This case involves a stock repurchase agreement by which Mr. Hitt sold stock in the Oilgear Company and Oilgear has failed to live up to the terms of that sale. When Hitt sold his stock in Oilgear, Hitt and Oilgear entered into a repurchase agreement. Oilgear issued Hitt a promissory note and Hitt, Oilgear and other creditors to Oilgear whom had provided the company with a revolving line of credit entered into a subordination and intercredit agreement. Pursuant to the terms of those agreements, Oilgear was required to pay Mr. Hitt a sum of money at clothing followed by three separate installments on June 3rd of 2015, 2016 and 2017. Oilgear made the first installment payment but has not made any payments since. It's a subordination agreement that is the critical agreement in this matter. I take it as conceded that between the dates of first and second payments there was a real default on the primary debt to JP Morgan? Yes. Can you repeat the question? I take it that is conceded that between the first and second payment dates there was an actual default. Yes. This is not something trumped up. There was no real default. There was there was a real default and that default was cured. JP Morgan agreed that the certain conditions were met and one of the conditions was not paying Hitt. Correct. Without JP Morgan's consent. Correct. Now I understand your position to be that Hitt never agreed to that condition. Let's suppose that's true and Oilgear says tomorrow morning and therefore we're going to pay Hitt even though JP Morgan hasn't approved. The day after that I should think JP Morgan will declare the default reinstated and then Oilgear, under the agreement between Oilgear and Hitt, will be forbidden to pay Hitt a penny. So how is Hitt going to be helped by the order you are asking us to enter in this litigation? Your Honor, the agreement between Oilgear and JP Morgan, whether it be a ill-advised agreement, does not affect Hitt. Yes it does because if Oilgear doesn't keep its promises to Morgan, Morgan reinstates the default and as soon as Morgan reinstates the default under the agreement between Oilgear and Hitt, Oilgear is forbidden to pay Hitt. So I don't understand, to go back to my initial point, I don't understand how the relief you're asking for would actually be relief for Hitt. Your Honor, in that situation, Oilgear would have already paid Mr. Hitt the money. No it won't. Hitt would have the money. It will say we are going to pay Hitt. Morgan will say the waiver of your default is revoked because we do not consent and at that point, Oilgear is in default of its obligations to Morgan. That's just the way these agreements work. I don't know that there's anything within the agreement that would support that interpretation. The agreement states that Oilgear must pay Hitt on the last specific days. It is in default to Morgan. And well then, Your Honor, if the entire contract being illusory. It's not illusory. If Oilgear is not in default to Morgan, then it pays. In fact, it paid the first installment. And it may be that Oilgear can find a way to get out of financial default. But what the situation as I now understand it, that's why I began my questioning as I did, is that Oilgear is in default but the default has been waived and there's a condition on the waiver. That means it is still in default. It hasn't paid all of the money owed to Morgan. That's why it's in default. Morgan can revoke the waiver if the terms of the deal between Oilgear and Morgan are not kept. That's where we are as I understand it. I don't know that they can revoke the waiver at this point. The contract says they can. The contract between Oilgear and Hitt does not state that. The contract between JP Morgan and Oilgear, to which Hitt was not a party, states that the waiver. I don't know. Maybe I'm just not being clear. Whether Oilgear is in default of its obligations to Morgan depends not on dealings between Oilgear and Hitt, but on dealings between Oilgear and Morgan. And the fact that Hitt is not a party to the dealings between Oilgear and Morgan doesn't mean that Oilgear is not in default to Morgan. I didn't read your brief as trying to say that Oilgear was not in fact in default to Morgan. I think where the are in default, but Morgan has waived particular remedies allowed by the default. You know, in the world of finance, that's the difference between curing a default and waiving a default. It's a pretty important distinction. They did cure the default through the amendment to the senior credit agreement. So our position and Hitt's position is that at the time that the June 3rd of 2016 payment was due and owing, Mr. Hitt, or the Oilgear company, was no longer in default to J.P. Morgan. And since they were no longer in default to J.P. Morgan, pursuant to the terms of the contract, they were required to make the installment payment to Mr. Hitt. Well, it doesn't actually say that though, right? It said that in the written consent of the senior creditor, so unless you can the written consent can't be unreasonably withheld, which you haven't really alleged. You haven't said that it was unreasonably withheld. I don't know where, you're ignoring the last part of the 2-3-B. The 2-3-B refers to payment, resuming payments which were missed under the application of 2-3-A. 2-3-A states that payments cannot be made if at the time that they become due, and I think that's a key phrase, that at the time they become due and owing, that Oilgear is in default. Our argument is that at the time the payments to Hitt became due on June 3rd of 2016, Oilgear was not in default. Therefore, they're required to make that installment payment. The effect of making that payment, whether it puts them back into default, is a separate issue, and I don't think we've reached that because they haven't made that payment, and they have not been reinstated into default. Well, 2-3-A had said at the time of such payment shall, subordinated creditor and company, shall have received a default, which we agree happened here, and then, and we agree that it was, by that point, cured or waived, but then, I think here, really, the argument is, I guess, is over what the meaning is of resume or where that comes in. Correct, Your Honor. That was the the issue that we had in the argument that was presented in the District Court, and in the District Court, the court in which Oilgear is trying to argue, as well, is that resume refers to, if you're in a default, you got out of default, doesn't matter if a payment was missed, resume is just taking up the obligation again. The language of 3.2b states that resume refers to the payment of debts, not the obligation to make payments to debts. Therefore, since at the time that the debt, at the time that Oilgear was in default, before it was cured, they never missed a payment, therefore, there's nothing to resume. No payments were missed, and that's supported by the fact that Oilgear... That interpretation reduces the parenthetical to a nullity, because the parenthetical specifically refers to missed payments. Those two clauses of that provision must mean two different things. One is the payment obligation, and the other is missed payments. Catch up, you know, catch up with missed payments. And I understand the Your Honor's point, but I believe that the parenthetical refers to just making the old payments that were already missed. So we resume making payments going forward, the parenthetical is referring to the payments that were already missed. Right, so the first resumption is the resumption of the debt obligation that was suspended based on the default. Correct, and going forward, and then the parenthetical refers to the further support for this is the fact that Oilgear and JP Morgan felt it necessary to amend the scenic credit agreement to specifically require their consent to make payments to HIT. If the reading of 2.3b states that they needed the written consent any time they would resume payments, there was no need for Oilgear and JP Morgan to amend the contract to require their written consent, because it was already there. So since Oilgear and JP Morgan felt it necessary to amend that contract and add that language, it is presumed that their interpretation of, or their intent of 3.2.3b did not require their written consent prior to resumption. But they did, if you're right, they did amend it, and Oilgear's position is that Section 3.1 of the Why is that not the case? They're not allowed to amend it for several reasons. First off, 3.1, the language of 3.1 does not state that they're allowed to amend the scenic credit agreement to affect or alter the terms of payment to HIT. 3.1 refers to amending the scenic credit agreement to alter the terms of payment on a senior debt, which is Oilgear's debt to JP Morgan. Nothing in 3.1 permits the Oilgear's debt to Mr. HIT. And if there aren't any further questions, I'd like to reserve. You have no time to reserve, counsel. Thank you. Mr. Schreiner. Good morning, Your Honors. May it please the Court. The questions that the Court has suggested to me that the Court has captured what I was trying to say in my brief, in particular the last point that Judge Sykes wrote about the effort to define resume as only applying when there's been a mispayment, just ignores the parenthetical. So from our point of view, you know, this was a payment that is precluded that Oilgear cannot make, and by the way, it acknowledges the full debt. It owes Mr. HIT $430,000 plus interest accruing, and someday, I'm confident, it will be paid. What makes you think that? I was thinking just inside knowledge. Between Oilgear and the banks, is it likely that the debt is ever going to be fully paid? That's not the way corporations operate? It is likely, Your Honor, because the business is up for sale and getting very near the time when the debt will be paid, but I can't obviously promise you because it's one of those deals that will be signed and closed on the same day, but I'm told soon, but I don't ask you to rely on that. They're behind. I mean, the whole purpose of a subordination agreement is they are, the senior creditor is first in right of time and payment, and sometimes you wait till the end of time, and you wait till the company is liquidated, and the senior creditor is ahead of you then too, and then if there's money left over, you get paid. That's the deal. That's the way it works. So I really have nothing else I want to argue. The, you know, both the 2.3b argument and the 6.15. 6.15 was obviously added. I guess the last thing I heard Mr. Maloney's argument make was that somehow 6.15's inclusion means that 2.3b didn't mean what it was an exhibit that would justify the existence of the Department of Redundancy Department. It would be a loan agreement and a subordination agreement. Everything in here has belt and suspenders three or four different ways, so whatever the rule is on construing statutes to avoid redundancy, it doesn't apply to this agreement. And just to close the circle on that and the point that Judge Easterbrook was making about the default both before and immediately after as a consequence of the payment, that's built into the definition of permitted subordinated debt payments, as I understand it, because it refers to defaults that exist or would exist because of the payment. So there are multiple redundancies here. These J.P. Morgan lawyers have been doing this for a number of years, and they're under advisement.